# In the United States Court of Federal Claims

No. 12-325
Filed: October 9, 2012
Reissued for publication: October 9, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| | Bid protest; |
| PHOENIX MANAGEMENT, Inc., | Executive Order 13,495, 74 FED. REG. 6103 (2009); |
| | Federal Acquisition Regulations |
| Plaintiff, | 3.104-7(a)(1) (duty to report violations involving proprietary or source selection sensitive information); |
| v. | 9.504(c) (resolving organizational conflicts of interest); |
| THE UNITED STATES, | 15.303(b) (source selection authority responsibilities); |
| Defendant, | 15.305(a) (evaluation of competitive proposals); |
| and | Procurement Integrity Act, 41 U.S.C. § 423 (2006); |
| ALLIANCE TECHNICAL SERVICES, Inc., | RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981); |
| Defendant-Intervenor. | RESTATEMENT (SECOND) OF TORTS, § 652C (1977); |
| | Supplementation of Administrative Record |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**John Charles Dulske**, Dulske & Gluys, P.C., San Antonio, Texas, Counsel for Plaintiff.

**Seth W. Greene**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**Michael John Gardner**, Troutman Sanders LLP, Norfolk, Virginia, Counsel for Intervenor-Defendant

## MEMORANDUM OPINION AND ORDER

**BRADEN**. *Judge*.

# I.  RELEVANT FACTUAL BACKGROUND.[1]

## A.  The Solicitation.

On August 12, 2011, the United States Air Force ("Agency") issued Solicitation No. FA4610-09-R-0013 ("Solicitation").  AR Tab 5 at 115.  The purpose of the Solicitation was to provide a wide range of support services required by the 576th Flight Test Squadron for Force Development Evaluation Minuteman Launches at Vandenberg Air Force Base, California.  AR Tab 2 at 7.  These services included, but were not limited to, "launch facility refurbishment, corrosion control services, vehicle issue and control, management services, and training services" and were "designated as 'mission essential' pursuant to Department of Defense Instruction 3020.37[.]"  *Id.*

The Solicitation required offerors to submit proposals in two parts, a price proposal and a technical proposal.  AR Tab 5 at 165.  The Solicitation stated that the Agency would use a four-step evaluation process to evaluate proposals and award the contract.  *Id.* at 168.  First, the Agency would evaluate each technical proposal for "Technical Acceptability."  *Id.*  Second, the Agency would determine if discussions were necessary.  *Id.*  Third, the Agency would rank all price proposals by price, highest to lowest.  *Id.*  Finally, the Agency would award the contract to the lowest priced technically acceptable offeror.  *Id.*

When determining a proposal's "Technical Acceptability," the Agency would examine each proposal using four evaluation subfactors:  (A) Understanding of Requirements and Technical Approach; (B) Technical Capability-Launch Refurbishment Services; (C) Technical Capability-Corrosion Control Services; and (D) Technical Capability-Vehicle Management Services.  *Id.* at 168-69.  Each subfactor would be evaluated "on a pass/fail basis" and would be assigned a rating of "Acceptable or Not Acceptable."  *Id.* at 168.

Under Subfactor A, a rating of "Acceptable" was to be given if

[o]fferor has conveyed an understanding of and a sound technical approach/methodology to fulfilling each of the following requirements: launch facility refurbishment, corrosion control services, maintenance programs management services, vehicle issue and control services, equipment issue and control services, training management services, and environmental management services[.]

AR Tab 5 at 168.

Under Subfactor B, a rating of "Acceptable" was given if

[t]he offeror has provided evidence that each proposed staff member performing launch refurbishment services has all of the following licenses, training, and

---

[1]  The relevant facts are derived from the June 8, 2012 Administrative Record, as amended on June 19, 2012 ("AR 1-43").

certifications: (a) National Commission for the Certification of Crane Operations/Part I Knowledge & Part II Practical Test (Certificate), (b) Confined Space Training (Certificate), and (c) has evidence of HAZWOPER training within the last year (either Initial 24-hr HAZWOPER Course (Certificate), or 8-hr HAZWOPER (Refresher Course Proof))[.]

AR Tab 5 at 169.

Under Subfactor C, a rating of "Acceptable" was given if

[t]he offeror has provided evidence that each proposed staff member performing corrosion control services has both of the following licenses, training, and certifications: (a) State of California Department of Health Lead Related Construction "Worker" certificate, (b) has evidence of HAZWOPER training within the last year (either Initial 24-hr HAZWOPER Course (Certificate), or 8-hr HAZWOPER (Refresher Course Proof)), and (c) Confined Space Training (Certificate)[.]

AR Tab 5 at 169.

Under Subfactor D, a rating of "Acceptable" was given if

[t]he offeror has provided evidence that at least one staff member performing vehicle management services has all of the following licenses, training, and certifications: (a) 20th Air Force ICBM Maintenance Instructors Course (Certificate) or equivalent training instructor/teaching qualifications, (b) State of California Dept of Motor Vehicles, Class "A" (3 Axle) Drivers License, (c) National Commission for the Certification of Crane Operators/Part I Knowledge & Part II Practical Test (Certificate) and (d) Forklift Operator (Certificate)[.]

AR Tab 5 at 169.

After determining whether an offeror's proposal was "Technically Acceptable," the Solicitation provided that the Agency would evaluate "each offeror's proposal for reasonableness and affordability." *Id.* The Solicitation defined "Reasonableness" as "a price to the Government that a prudent person would pay in the conduct of competitive business." *Id.* at 170. The Solicitation stated that "price reasonableness" would be "established through price competition," requiring the Agency to conduct an "affordability assessment" that would "consider the total estimated contract price as compared to the project budget for [the] program." *Id.* Finally, under the price evaluation factor set forth in the Solicitation, the Agency would rank all offerors "according to price (including any option prices), from highest to lowest," and award the contract to the lowest priced technically acceptable offeror. *Id.*

**B.      The Proposals.**

Four offerors, including Phoenix Management, Inc. ("Phoenix" or "Plaintiff") and defendant-intervenor Alliance Technical Services, Inc. ("ATS"), submitted proposals in response to the Solicitation.   The Agency deemed all offerors' proposals timely and technically acceptable.  AR Tab 13 at 730, 746; AR Tab 39 at 1548-49.  The two proposals at issue here are those of Phoenix and ATS.

On September 12, 2011, Phoenix submitted a proposal.  AR Tab 6.   The Agency evaluated Phoenix's proposal as acceptable in all four technical subfactors.  AR Tab 9 at 746-48. The Agency rated Phoenix's proposal second overall.  AR Tab 33 at 1265.

On September 15, 2011, ATS submitted a proposal.  AR Tab 7.  On September 26, 2011, the Agency found ATS's proposal as acceptable in all four technical subfactors.  AR Tab 9 at 675-79.

On November 2, 2011, the Agency issued a Notice to Unsuccessful Offerors identifying ATS as the apparent successful offeror.  AR Tab 12 at 717.

On November 4, 2011, the Agency completed a Proposal Analysis Report detailing its analysis of all four proposals.  AR Tab 13 at 729-50.

## II.      PROCEDURAL HISTORY.

**A.      Before The Government Accountability Office.**

On November 14, 2011, Phoenix filed an initial protest with the Government Accountability Office ("GAO") challenging the Agency's award of the contract to ATS.   AR Tab 21 at 1011, 1034-37.  Phoenix disputed the award on the grounds that: (1) the agency failed to reject ATS's proposal "where ATS improperly obtained access to inside, non-public, competitively useful information and non-public proprietary information of PMI not otherwise available to other offerors, and used this information in the preparation of [ATS's] proposal;" (2) as a result of ATS's proposed project manager's "unauthorized use of PMI's proprietary data," ATS had "an unmitigable unequal access to information organizational conflict of interest (OCI);" (3) ATS, through these actions, violated the Procurement Integrity Act ("PIA"); and (4) the Agency's "evaluation of [ATS's] price proposal was prejudicially flawed."  AR Tab 21 at 1022-23; *see also* Procurement Integrity Act, 41 U.S.C. § 423 (2006).  Phoenix also challenged ATS's use of credentials held by employees of URS Federal Services ("URS").  *Id.* at 1025, 1035-36.

On November 16, 2011, Phoenix submitted a notice of a PIA violation, which asserted that ATS improperly obtained and used the licenses, certifications, and training records of certain Phoenix employees to meet the technical requirements.  AR Tab 22 at 1049, 1050-51.  Phoenix said that these employees' documents were Phoenix's "source selection information" and "proprietary information."  *Id.* at 1050.  Phoenix also contended that ATS's use of Phoenix's employees' licenses, certifications, and training records in ATS's proposal constituted a violation of the PIA.  *Id.* at 1050-51.

On November 18, 2011, the Agency submitted a request partially to dismiss Phoenix's protest as speculative.  AR Tab 23.

On November 28, 2011, Phoenix submitted a first supplemental protest with the GAO. AR Tab 24 at 1148.  Phoenix included as exhibits to this submission, November 8, 2011 statements from, among other Phoenix personnel, ██████, ██████, and ██████, stating: "Please be advised that I have not been asked for my resume or any certificates nor have I authorized the use of the same except to Phoenix Management Incorporated." *Id.* at 1188-90.

On November 29, 2011, the Agency informed the GAO that it "intends to investigate the allegation that [ATS] violated the [PIA] and that it has an unmitigable [OCI]."  AR Tab 25 at 1205.  In light of the Agency's decision to take corrective action, the GAO was requested to dismiss Phoenix's protest as moot.  *Id.*

On November 30, 2011, Phoenix objected to the corrective action as inadequate, because it did not address Phoenix's contentions that the Agency relaxed its stated evaluation criteria in ATS's favor or that ATS misrepresented its permission to use Phoenix employees' credentials in its proposal.  AR Tab 43 at 1621.

On December 1, 2011, the GAO dismissed Phoenix's protests.  AR Tab 27 at 1212-13.

On January 11, 2012, the Contracting Officer ("CO") issued Determinations and Findings, concluding: (1) pursuant to FAR 3.104-7(a)(1), "the information which was allegedly disclosed to ATS did not constitute proprietary or source selection sensitive information." (AR Tab 30 at 1225); (2) the employees voluntarily provided the information "without any involvement or control by the Government."  *Id.*; (3) pursuant to FAR 9.504(c), "no organizational conflict of interest exists, no unequal access to OCI information has occurred providing an unfair competitive advantage to ATS, and . . . it did not compromise the integrity of the procurement or award process."  AR Tab 31 at 1243; and (4) Phoenix's allegations of a possible PIA violation were "unsupported and without merit."  AR Tab 39 at 1551 (citing AR Tab 30 at 1223).

On February 17, 2012, the Agency issued a Contract Award Notice affirming the initial award to ATS.  AR Tab 32.

On February 27, 2012, Phoenix filed a new protest with the GAO.  AR Tab 34.

On March 13, 2012, ATS moved to dismiss Phoenix's February 27, 2012 GAO protest. AR Tab 37.

On March 14, 2012, the Agency informed the GAO that it concurred with ATS's motion to dismiss.  AR Tab 38.

On March 28, 2012, the CO signed a Statement of Facts asserting that the Agency "properly evaluated the solicitation."  AR Tab 39 at 1568.

On April 9, 2012, Phoenix filed Comments to the Agency Report, which reiterated Phoenix's arguments and requested a hearing.  AR Tab 41.

On May 17, 2012, the GAO denied Phoenix's protest and rejected Phoenix's contentions that ATS materially misrepresented in its proposal that: certain personnel would be available to perform the contract; ATS violated the PIA; and ATS had an impermissible OCI.  AR Tab 42 at 1611-16.

## B.    Before The United States Court Of Federal Claims.

On May 23, 2012, Phoenix filed a two-count Complaint For Injunctive And Declaratory Relief in the United States Court of Federal Claims against the United States ("the Government") for violating 10 U.S.C. § 2305(b)(1), FAR 15.303(b)(4), and FAR 15.305(a).  In addition, Phoenix filed an Application For A Temporary Restraining Order and Motion For A Preliminary Injunction.  These filings were submitted and placed under seal.

On May 23, 2012, Phoenix filed Plaintiff's Motion For Protective Order.

On May 25, 2012, ATS filed an unopposed Motion To Intervene Pursuant To Rule 24(a)(2).  On May 30, 2012, the court granted that motion.

On May 29, 2012, the Government filed an unopposed Motion For Protective Order.  On May 31, 2012, the court issued a Protective Order.

On May 29, 2012, the parties filed a Proposed Schedule Pursuant To Court Order.  On May 31, 2012, the court issued a scheduling order.

On May 30, 2012, Phoenix filed Plaintiff's Motion For Discovery.  On June 15, 2012, the court issued an order denying the motion for the reasons stated during a telephone status conference.

On June 8, 2012, the Government filed Defendant's Motion For Leave To File The Administrative Record On CD.  On June 11, 2012, the court granted that motion.

On June 8, 2012, the Government filed Defendant's Notice Of Filing Administrative Record.

On June 12, 2012, Phoenix filed a Motion And Brief In Support To Supplement The Administrative Record And The Court's Record ("First Mot. Supp."), with May 22, 2012 declarations from two URS employees.  On June 12, 2012, the Government filed Defendant's Motion To Strike those declarations (Compl. Ex. Nos. 23 and 24).  On June 14, 2012, Phoenix filed a Response.  On June 15, 2012, the court indicated that it likely would not permit supplementation of the Administrative Record, but that it would withhold a ruling until issuing a final decision on the merits.  Today, the court denies Phoenix's June 12, 2012 Motion and grants the Government's June 12, 2012 Motion.[2]

---

[2]  The Administrative Record should be limited "to the record actually before the agency . . . to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'"  *Axiom Res. Mgmt., Inc.* v. *United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) (quoting *Murakami* v. *United States,* 46 Fed. Cl. 731, 735 (2000),

On June 19, 2012, the Government filed an Unopposed Motion To Amend/Correct The Administrative Record. On June 19, 2012, the court granted the motion. On June 20, 2012, the Government filed Defendant's Notice Of Filing The Corrected Administrative Record.

On June 22, 2012, Phoenix filed a Motion For Judgment On The Administrative Record ("Pl. Mot. JAR"). On July 9, 2012, the Government filed Defendant's Motion For Judgment Upon The Administrative Record And Response To Plaintiff's Motion For Judgment Upon The Administrative Record ("Gov't Mot. JAR"). On July 9, 2012, ATS also filed a Motion For Judgment On The Administrative Record ("Int. Mot. JAR").

On July 25, 2012, Phoenix filed a Combined Response To Defendant's And Intervenor's Motions For Judgment On The Administrative Record.

On August 6, 2012, ATS filed a Motion To Dismiss Pursuant To RCFC 12(b)(1) And Reply To The Combined Response To Defendant's And Intervenor's Motions For Judgment On The Administrative Record ("Int. Mot. Dismiss"). On September 6, 2012, Phoenix filed a Response ("Pl. Resp. To Int. Mot. Dismiss"). On September 7, 2012, the Government filed a Response. On September 24, 2012, ATS filed a Reply ("Int. Reply Mot. Dismiss").

On September 6, 2012, Phoenix filed a second Motion To Supplement The Administrative Record And The Court's Record with the September 6, 2011 questions and answers accompanying Amendment 0005 to the Solicitation ("Second Mot. Supp."). *See* Second Mot. Supp., Ex. A. On September 24, 2012, the Government filed a Response. On September 24, 2012, ATS filed a Response included in its Reply to the Responses to its August 6, 2012 Motion To Dismiss. Int. Reply Mot. Dismiss. Today, the court grants Phoenix's September 6, 2012 second Motion To Supplement The Administrative Record And The Court's Record.[3]

---

*aff'd,* 398 F.3d 1342 (Fed. Cir. 2005)). The declarations that Phoenix requested to add to the Administrative Record were not "actually before the agency[,]" but instead were made after the completion of the Agency's investigation and the GAO's denial of Phoenix's protest. Although Phoenix asserts that supplementation is necessary to enable the court "to conduct a full, fair and complete [Administrative Procedure Act] review of the Government's final agency decision[,]" First Mot. Supp. at 8, the declarations offer evidence as to the correctness of the Agency's conclusions rather than whether the Agency had a rational basis to reach those conclusions. The Administrative Record already contains February 23, 2012 declarations from the same two declarants. AR Tab 34 at 1352, 1354. Those declarations are sufficient for this court to exercise rational basis review of the Agency's actions.

[3] Supplementation of the Administrative Record is appropriate where necessary in order not "to frustrate effective judicial review." *Camp* v. *Pitts*, 411 U.S. 138, 142-43 (1973). The supplementation requested by Phoenix's September 6, 2012 Motion is relevant to the court's analysis of standing and is therefore necessary for effective judicial review. *See infra*, Section III.B (quoting language in the supplemented record to clarify an ambiguous Solicitation requirement).

III.    DISCUSSION.

A.    Jurisdiction.

The May 23, 2012 post-award bid protest Complaint in this case alleges that the November 9, 2011 award to ATS violated 10 U.S.C. § 2305(b)(1) (2006), FAR 15.303(b)(4), and FAR 15.305(a) because the Agency did not reject ATS's technical proposal for failing "to provide evidence that each proposed staff member' 'has' all of the required licenses, training, and certifications consistent with the evaluation criteria in Subfactors B and C."  Compl. ¶ 105. The Complaint also alleges that ATS made a material false statement in its technical proposal and that the Agency relied on that false statement in finding the technical proposal acceptable, so that "[t]he Agency's investigation, findings and conclusion that there was no misrepresentation and its evaluation of ATS' technical proposal were arbitrary, capricious and irrational[.]"  Compl. ¶¶ 96-98.

The Complaint further alleges that the GAO acted arbitrarily and capriciously in refusing to grant a hearing on the matter and in issuing the May 17, 2012 decision.  Compl. ¶¶ 99, 103.  It is settled that the United States Court of Federal Claims has no jurisdiction to review GAO actions.  *See Health Sys. Mktg. & Dev. Corp.* v. *United States,* 26 Cl. Ct. 1322, 1325 (1992) (stating that the court does not "act as an appeals court for the Comptroller General's decisions"). The United States Court of Federal Claims, however, does have jurisdiction to review an agency's decision to follow a GAO recommendation.  *See Turner Const. Co., Inc.* v. *United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) (affirming the court's determination that an agency decision to follow a GAO recommendation was arbitrary and capricious).

Pursuant to 28 U.S.C. § 1491(b)(1) (2006), the United States Court of Federal Claims has jurisdiction

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

Accordingly, 28 U.S.C. § 1491(b)(1) authorizes the court to adjudicate the claims alleged in the May 23, 2012 Complaint.

B.    Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1).  *See Myers Investigative & Sec. Servs., Inc.* v. *United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue.").  The United States Court of Appeals for the Federal Circuit has construed the term "interested party" to be synonymous with the definition of "interested party" provided in the Competition in Contracting Act of 1984, 31 U.S.C. § 3551(2)(A) ("CICA").  *See Rex Serv. Corp.* v. *United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" to convey standing

under 28 U.S.C. § 1491(b)(1)).  A two-part test is applied to determine whether a protester is an "interested party," a protestor must establish that: "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc.* v. *United States,* 539 F.3d 1340, 1344 (Fed. Cir. 2008).

Intervenor ATS asserts that Phoenix has no direct economic interest in this case because Phoenix did not submit a qualifying bid.  Int. Mot. Dismiss 2-8.  Specifically, Phoenix failed to comply with the Solicitation requirement that "at least one staff member performing vehicle management services has all of the following licenses, training, and certifications[.]"  *Id.*  ATS asserts that no Phoenix staff member satisfied the entire list of qualifications.  *Id.* at 7.  ATS also asserts that the Solicitation unambiguously requires a single staff member to possess all of the qualifications, and that the Solicitation cannot be modified without amendment.  Int. Reply Mot. Dismiss at 2-3 (citing FAR § 15.206).

Phoenix responds that a single Phoenix staff member, ▮▮▮▮▮, met the entire list of qualifications.  Pl. Resp. To Int. Mot. Dismiss 3-5.  In addition, Phoenix asserts that the language of the Solicitation, although ambiguous, requires only that for each qualification an offeror must be able to identify at least one staff member who met that qualification.  *Id.*  An Agency statement supports Phoenix's interpretation.  In its questions and answers accompanying Amendment 0005 to the Solicitation, issued on September 6, 2011, the Agency stated, "Government understands that one person or more than one person may possess all [of the qualifications] or some combination thereof for fulfilling all certification requirements" of the solicitation provision in question.  Second Mot. Supp., Ex. A at 17 (FA4610-09-R-0013, 576 FLTS Minuteman Launch Support Services, Questions and Answers as of 6 Sep 2011); *see also* AR Tab 6 at 359 (acknowledging that Phoenix received Amendment 0005 before submitting its bid).  In addition, the Agency later concluded that Phoenix's proposal satisfied the standard set out in the Solicitation.  AR at 684 (finding that Phoenix made "[a]ll certifications/licenses requested for this Subfactor were provided to show evidence that staff *members* met requirements" (emphasis added)).

The Government argues that the "PADMAF Training Course" completed by ▮▮▮▮▮ (AR Tab 6 at 495) does not satisfy the certification requirement in the Solicitation: "20th Air Force ICBM Maintenance Instructors Course (Certificate) or equivalent training instructor/teaching qualifications[,]" AR Tab 5 at 169.  But neither the Government nor ATS disputes that at least one PMI staff member held the necessary credentials.  Given the Agency's published interpretation of the ambiguous Solicitation and its conclusion that Phoenix met the requirement in question, the court has determined that Phoenix met its burden to establish that it submitted a qualified bid.

A second standing requirement is that the protestor must show that the alleged errors in the procurement were prejudicial.  *See Labatt Food Serv., Inc.* v. *United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal quotation marks omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").  Prejudice is demonstrated where the protestor "can show that but for the error, it would have had a substantial chance of securing the contract."  *Labatt,* 577

F.3d at 1378. Importantly, a proper standing inquiry must not conflate the requirements of "direct economic interest" and prejudicial error. *Id.* at 1380 (explaining that examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful").

If, as Phoenix asserts, the Agency erred in awarding ATS the contract, Phoenix would have had a substantial chance of securing the contract. *See* AR Tab 33 at 1265 (stating that the Agency rated Phoenix's bid second overall). Therefore, the court has determined that Phoenix has standing to contest the award of the contract at issue in this case.

### C.   Standard Of Review.

Pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is required to review challenges to an agency decision, pursuant to the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) (2006) (The reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Banknote Corp. of Am., Inc.* v. *United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"). The United States Court of Appeals for the Federal Circuit has provided the trial courts with specific guidance in how to analyze the required showings for injunctive relief under APA standards.

The United States Court of Appeals for the Federal Circuit has held that a bid award may be set aside if "the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc.* v. *United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit has clarified, however, that when a contract award is challenged, based on regulatory or procedural violation, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt.* v. *United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (internal quotation marks omitted).

If an award decision is challenged as arbitrary, capricious, or lacking a rational basis, the trial court "must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors." *Savantage Fin. Servs.* v. *United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) (internal alterations, quotation marks, and citations omitted); *see also Centech Grp., Inc.* v. *United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (holding that the trial court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.").

The court may set aside the procurement, but "only in extremely limited circumstances." *United States* v. *John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). This rule recognizes a zone of acceptable results in each particular case and requires that the final decision evidences that the agency "considered the relevant factors" and is "within the bounds of reasoned decision making." *Baltimore Gas & Elec. Co.* v. *Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983); *see also Weeks Marine*, 575 F.3d at 1368-69 ("We have stated that procurement decisions invoke . . . highly deferential rational basis review. . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotation marks and citations omitted).

On a motion for judgment on the administrative record, the court is required to determine whether the plaintiff has met its burden of proof to show that the challenged procurement action was without a rational basis or not in accordance with the law. *See Banknote*, 365 F.3d at 1353 (addressing the standards for reviewing judgments in bid protest cases); *Afghan Am. Army Servs. Corp.* v. *United States*, 90 Fed. Cl. 341, 355 (2009) ("In reviewing cross-motions for judgment on the administrative record, the court must determine 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'") (citations omitted). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, nor is the court required to conduct an evidentiary proceeding. *See Bannum* v. *United States*, 404 F.3d 1346, 1353-54 (2005) ("RCFC [52.1] requires the [United States] Court of Federal Claims, when making a prejudice analysis in the first instance, to make factual findings from the record evidence as if it were conducting a trial on the record.").

## D.     Issues Raised By Plaintiff's Motion For Judgment On The Administrative Record.

### 1.     Whether Defendant-Intervenor's Proposal Contained Material Misrepresentations.

#### a.     The Plaintiff's Argument.

Phoenix argues that ATS's bid misrepresented the qualifications of its workforce, because it listed the qualifications of people who had not made a "commitment" to work for ATS. Pl. Mot. JAR at 13-14, 16. Such a commitment is required by virtue of the "mission essential" nature of the contract and the Solicitation's language requiring evidence of each proposed staff member's credentials. *Id.* at 4-5. This mission is "vitally dependent upon having a qualified and experienced workforce ready and capable of providing the required support services." *Id.* at 4 (quoting language used for the bridge contract awarded during this protest). For this reason, three of the four subfactors within the technical factor in the Solicitation required "'evidence that each proposed staff member performing' services 'has' specified credentials[.]'" *Id.* at 5 (quoting AR Tab 5 at 169).

Phoenix quotes a GAO decision for the proposition that any consideration of proposed employees in the bid evaluation process requires that "the [A]gency must reasonably be assured that the employee, subcontractor, etc., is firmly committed to the offeror." *Mgmt. Servs., Inc.*, 55

Comp. Gen. 715, 732 (1976).   Such a commitment is especially important "where the consideration of the factor in question may be determinative of the award." *Id.* at 732-33.  If no commitment is necessary, Phoenix asserts, "an offeror could simply conduct an internet search of individuals possessing the required credentials, include those individuals as the offeror's 'proposed workforce' and receive an 'Acceptable' technical rating without ever once contacting the individuals."  Pl. Mot. JAR at 14.

Phoenix asserts that ATS, by including the credentials of five predecessor contractors' employees in its proposal, represented that those individuals "agreed (formally or informally) to become employed by ATS upon award in the capacity represented."  *Id.* at 21.  Although this representation is implied, "[a]n assertion may . . . be inferred from conduct other than words." *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 159 cmt. a (1981)).

██████ and ██████, two URS employees whose credentials ATS listed in its proposal, signed identical memoranda dated February 23, 2012, stating that they were not asked for their resumes or certificates by ATS "nor have I authorized the use of the same except to URS."  AR Tab 34 at 1352, 1354.

Nevertheless, the Agency relied on ATS's representations that ██████, ██████, and three Phoenix employees—██████, ██████, and ██████—would be members of ATS's workforce.  AR Tab 7 at 639-42, 647-48, 652, 654, 659-65 (photocopies of credentials); AR Tab 9 at 677-79 (the Agency's determination that ATS met three technical subfactor requirements, based on certifications and licenses that ATS provided).

### b.    The Government's Response.

As a threshold issue, the Government objects to Phoenix's suggestion that the language quoted from the bridge contract awarded during this bid protest case should inform the court's interpretation of the Solicitation.  Gov't Mot. JAR at 16-20.  The Government also argues that ATS's proposal to recruit and hire personnel from the incumbent workforce was "neither unusual [n]or [] inherently improper[.]"  *Consol. Eng'g Servs., Inc.* v. *United States*, 64 Fed. Cl. 617, 634 (2005)) (alterations in original).  Indeed, as a matter of law, a successor contractor must give a predecessor contractor's employees the right of first refusal of employment under the new contract.  *See* Exec. Order No. 13,495, 74 FED. REG. 6103 (2009).

As for GAO's decision in *Management Services*, not only is that case not binding precedent, but GAO decision is distinguishable for three reasons: the Solicitation in this case did not require "contractual relationships" with proposed staff members, the Agency did not accept "without more" ATS's assertions about its proposed staff members, and ATS made clear in its proposal that it did not have a contractual relationship with the proposed staff members.  Gov't Mot. JAR at 23-24; AR Tab 7 at 639 (quoting the ATS technical proposal saying "we intend to offer the various Management and Refurbishment Section positions proposed to the following individuals").

### c.    The Intervenor-Defendant's Response.

ATS responds that it met the Solicitation's requirements by providing photocopied credentials of proposed staff members. Int. Mot. Dismiss at 8-10, 17. Although the Solicitation did not explicitly define what level of commitment was required from proposed staff members, "[g]iven the history of the contracted services, it was likely that a substantial number of incumbent workers would be retained by the eventual successful offeror and the Agency reasonably considered submission of the Credentials would be sufficient for its purposes." Int. Mot. JAR at 14 (citing AR Tab 2 at 7 (describing the tasks defined in the Solicitation, but not the sufficiency of the requested credentials)). Accordingly, the Agency acted within its discretion when it determined the adequacy of the evidence of staff commitment while evaluating the proposals. *Id.* at 15.

### d.      The Court's Resolution.

Interpretation of the Solicitation is a question of law. *See Banknote,* 365 F.3d at 1353. "[T]he language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances." *Metric Constructors, Inc.* v. *Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999) (quoting *Hol–Gar Mfg. Corp.* v. *United States,* 351 F.2d 972, 975 (Ct. Cl. 1965)); *see also Banknote,* 365 F.3d at 1353 n.4 (stating that the principles for interpreting contracts apply equally to interpreting solicitations). The issue before the court is whether a "reasonably intelligent person acquainted with the contemporaneous circumstances" would read the Solicitation as requiring an offeror to submit credentials only for workers who had committed to join its workforce if the Agency awarded the offeror the contract.

The fifty-eight page Solicitation offers little guidance about whom offerors could count as a member of the workforce that would perform the contract tasks. Three of the Solicitation's four technical subfactors required offerors to "[p]rovide evidence that the offeror's workforce is trained and licensed" to perform various duties. AR Tab 3 at 76. Taken alone, that wording suggested that the Agency intended to evaluate only the offerors' current workforces at the time the proposals were submitted. Three pages later, however, the Solicitation stated the Agency would evaluate the credentials of "each proposed staff member" performing the various duties. *Id.* at 79. As such, the Solicitation requires nothing, other than the credentials themselves, as evidence that proposed staff members would become actual staff members if the Agency awarded the contract to the bidder. *Id.* at 23-80. The plain language of the Solicitation does not resolve the meaning of "proposed staff member."

Although "proposed staff member" is not clearly defined in the Solicitation, this term has at least one implication as a matter of law. If a bidder lists a proposed staff that it does not intend to hire, such a statement has been construed as a misrepresentation. *See Planning Research Corp.* v. *United States*, 971 F.2d 736, 739-41 (Fed. Cir. 1992). In *Planning Research*, our appellate court affirmed a General Services Board of Contract Appeals decision finding that the successful bidder performed an "intended 'bait and switch'" when forty-two of seventy-four employees actually selected for the contract were different than the ones proposed. *Id.* In this case, however, Phoenix offers no evidence that ATS performed a "bait and switch" or that ATS did not intend to hire the staff members it listed in its proposal. While *Planning Research* stands for the proposition that offerors must intend to hire proposed employees, Phoenix argues there also must be a commitment by the prospective employees to accept that work. Phoenix,

however, cites no authority for the suggestion that proposed staff members must commit to accept work if the Agency awards the bidder the contract.[4] Neither our appellate court's holding in *Planning Research* nor any language in the Solicitation requires such a commitment.

Nor do the "contemporaneous circumstances" persuade the court that "proposed staff members" must have made such a commitment to the offeror. A person acquainted with contemporaneous circumstances would, as Phoenix argues, understand that the mission the contract supported was "vitally dependent upon having a qualified and experienced workforce ready and capable of providing the required support services." Pl. Mot. JAR at 4 (quoting language from the bridge contract awarded during this bid protest case). Although this language suggests that having commitments from proposed staff members would be useful, it does not demonstrate that such commitments were required. Instead, a "reasonably intelligent person acquainted with the contemporaneous circumstances" would ask why, if the Agency desired a commitment from each proposed staff member, it did not request clear evidence of that commitment. *C.f., e.g.*, *Planning Research*, 971 F.2d at 737 n.2 (describing a solicitation requiring statements "defining the extent of corporate commitment to the dedication of each person" for key personnel and requiring commitment letters from non-key personnel who were not currently employed by the offeror); *see also Corp. Am. Research Assocs., Inc.*, B-228579, 1988 WL 227048 (Comp. Gen. Feb. 17, 1988) (ruling that an offeror was not prejudiced when an agency reopened negotiations and requested a new round of best and final offers after it discovered the offeror's proposal did not include required letters of commitment).

Not requiring such a commitment would make sense to "a reasonably intelligent person acquainted with the contemporaneous circumstances" surrounding this case. Employees of the predecessor contractor were prime candidates to work for the successor contractor, both because of their experience and because of the Executive Order requiring they be given the right of first refusal under the new contract. *See* Exec. Order No. 13,495, 74 FED. REG. 6103 (2009); AR Tab 3 at 79 (listing the training and credentials required for proposed staff members under the Solicitation). But, during the contracting process those employees may have believed—correctly or incorrectly—that they were under pressure from their current employer not to make any commitments to a rival contractor. For example, when the CO interviewed ███████ on December 16, 2011, "███████ advised he was concerned about his current employment with

---

[4] Phoenix cites the GAO decision in *Management Services*. That decision cites a United States District Court case whose facts are much more similar to the "bait and switch" scenario of *Planning Research* than to the facts of the instant case. *See* 55 Comp. Gen. at 715 (citing *Rudolph F. Matzer & Associates, Inc.* v. *Warner*, 348 F. Supp. 991, 995 (M.D. Fla. 1972)). In *Matzer*, the agency awarded a contract based, in part, on a comparison of the proposers' workforces, but one of the awardee's proposed staff members was dead at the time his resume was submitted and only one of the eight people who eventually performed the contract was among those whose resumes the awardee submitted. 348 F.Supp. at 993. The GAO concluded that "the evaluation of personnel qualifications on the basis of resumes of persons who are not employed by an offeror *and who will not perform the work* is patently irrational." *Id.* at 995 (emphasis added). Of course, there is a substantial difference between proposing staff members (including a dead person) "who will not perform the work" and proposing staff members who have not committed to perform the work.

[Phoenix], which would have ended with the award of the new contract to ATS. ███ signed the statement [that he had not authorized anybody other than Phoenix to use his credentials] when requested by ███, [Phoenix] Manager[,] for fear of retribution from [Phoenix]."  AR Tab 30 at 1224 (Jan. 11, 2012 findings of the CO).  Similarly, when asked about the discrepancy between the statement he had signed and the information he provided the CO, "███ verbally stated he felt his job was in jeopardy and signed the statement when requested by ███, [Phoenix] Manager." *Id.* at 1225.

Phoenix asserts that the Solicitation must require a commitment, because otherwise "an offeror could simply conduct an internet search of individuals possessing the required credentials, include those individuals as the offeror's 'proposed workforce' and receive an 'Acceptable' technical rating without ever once contacting the individuals."  Pl. Mot. JAR at 14. But an offeror would have at least two reasons not to use such an approach.  The first would be the prospect of being unable to hire enough members of its proposed workforce to avoid losing the award under the "bait and switch" scenario identified by *Planning Research*.  The second would be the prospect of tort liability.  *See Moore* v. *Big Picture Co.*, 828 F.2d 270, 275-76 (5th Cir. 1987).  In *Moore*, an offeror's proposed staffing chart listed an employee of the current contractor without that person's permission. *Id.* at 271.  The United States Court of Appeals for the Fifth Circuit affirmed a judgment against the offeror for misappropriating the employee's name. *Id.* at 275-76; *see also* RESTATEMENT (SECOND) OF TORTS, § 652C (1977) ("One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy.").  This court expresses no opinion as to whether the facts in the instant case would support any such cause of action.

For these reasons, neither the Solicitation's language nor the contemporaneous circumstances support an interpretation requiring commitments from the proposed staff members to work for the offeror.  Because no such requirement existed, ATS did not make material misrepresentations[5] by including in its proposal credentials of people who had not committed to serve as its staff members.

> **2.  Whether The Agency Evaluated Defendant-Intervenor's Technical Proposal On The Factors Specified In The Solicitation.**
>
> **a.  The Plaintiff's Argument.**

---

[5] "A misrepresentation is an assertion that is not in accord with the facts."  RESTATEMENT (SECOND) OF CONTRACTS § 159 (1981).  ATS's proposal did not represent that it had employment commitments from the proposed staff members whose credentials ATS submitted. In fact, ATS's proposal stated only that ATS intended to offer the individuals employment to perform contract tasks if ATS was awarded the contract.  AR Tab 7 at 639.  Phoenix's allegation that ATS made material misrepresentations thus assumes the following elements: (1) the Solicitation required offerors to have commitments from their proposed staff members, (2) ATS had no such commitments, and (3) ATS's submission of its proposal created an implied assertion that it had such commitments.

Phoenix also contends the Agency did not evaluate ATS's technical proposal in accordance with the criteria specified in the Solicitation. Compl. ¶ 105 (alleging violations of 10 U.S.C. § 2305(b)(1), FAR § 15.303(b)(4), and FAR § 15.305(a)).

"[B]y requiring the submission of evidence for each proposed worker showing they possessed the requisite credentials, the Solicitation in turn required offerors to obtain commitments from these individuals prior to proposal submission." Pl. Mot. JAR at 16. Had the Agency's evaluation of ATS's proposal required the existence of such commitments, the Agency would have rejected ATS's technical proposal. *Id.* at 17-18.

The Government concedes that the Solicitation required offerors to submit something more than a list of the predecessor contractor's employees. AR Tab 40 at 1574 (GAO decision stating that the Agency disavowed the CO's assertion that such a list would be sufficient); AR Tab 34 at 1284 (Phoenix's GAO Protest, quoting the CO's January 11, 2012 Determinations and Findings); AR Tab 34 at 1311 (the CO's January 11, 2012 Determinations and Findings, stating that "[a]ny offeror who represented to the Government that it intended to hire the incumbent's workforce to fulfill the requirements which necessitated possession of the licenses, certifications, and training requirements in question would have been determined to have met the standard of possession of the licenses, certifications, and training requirements needed"). Phoenix argues that this means "the Solicitation does not permit offerors to propose the hiring of the incumbent workforce and, in turn, satisfy the Solicitation requirements," and that this is exactly what ATS did. Pl. Mot. JAR at 17.

#### b.      The Government's Response.

The Government responds that, because the Solicitation did not require the offerors to obtain commitments from their proposed staff members, the Agency did not err in its evaluation of ATS's proposal. Gov't Mot. JAR at 26. The Government further argues that the inconsistency between the CO's statement and the Solicitation's requirements does not establish that the Agency did not follow the criteria as stated in the Solicitation. *Id.* at 27. "While the agency agrees that the statement is inconsistent with the solicitation criteria, the statement was not the basis for the award decision. The award decision was based upon evaluations of the offeror's proposal conducted by a technical evaluation team." AR Tab 40 at 1574.

#### c.      The Defendant-Intervenor's Response.

"The administrative record unequivocally demonstrates that the Agency properly evaluated all four proposals in accordance with the stated Solicitation terms and adequately documented its award decision for this procurement." Int. Mot. JAR at 13 (citing AR Tab 13 at 729-50; Tab 14 at 751-53).

#### d.      The Court's Resolution.

As discussed above, the terms of the Solicitation did not require any commitment from the proposed staff members to work for the successful offeror. Thus, although Phoenix characterizes the May 23, 2012 Complaint as a challenge to the Agency's evaluation of the proposals, it actually challenges the Solicitation and the Agency's decision not to evaluate

proposals on the basis of the proposed workers' commitment.  *See Blue & Gold Fleet, L.P.* v. *United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that if a solicitation did not include a given requirement, the agency could not decide at the time of the evaluation to apply that requirement, and the protestor's assertion that the agency should have done so was a challenge to the solicitation rather than to the agency's evaluation).

Similar analysis shows that the Agency did not violate FAR § 15.303(b)(4), which states that "[t]he source selection authority shall [e]nsure that proposals are evaluated based solely on the factors and subfactors contained in the solicitation," or FAR § 15.305(a), which states in pertinent part, "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation."

In addition, Phoenix cites no evidence in the Administrative Record that the Agency evaluated ATS's technical proposal on factors other than those specified in the Solicitation. Phoenix does cite the CO's statement that a proposal listing the incumbent workforce, without photocopies of the required credentials, would have been rated acceptable.  AR Tab 34 at 1311. But this misstatement discussed a hypothetical situation.  *Id.*  (stating that such an offeror "*would have been* determined to have met the standard" (emphasis added)).  The Administrative Record shows that ATS's proposal included five staff members from the incumbent contractors, that ATS complied with the Solicitation requirements by submitting photocopies of their credentials (AR Tab 7 at 641-42, 647-48, 652, 660-65), and that the Agency evaluated ATS's proposal based on those credentials, AR Tab 13 at 735 (Proposal Analysis Report describing the photocopies ATS provided).  The Agency therefore met its obligation to "evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."  10 U.S.C. § 2305(b)(1).

> **3.  Whether The Agency Acted Arbitrarily And Capriciously In Its Evaluation of** Defendant-Intervenor's **Technical Proposal And In Its Investigation Into Alleged Misrepresentation.**

> **a.  The Plaintiff's Argument.**

Phoenix asserts that the Agency acted arbitrarily and capriciously in evaluating ATS's technical proposal

> because the Contracting Officer, (a) entirely failed to consider important aspects of the misrepresentation issue in connection with his decision that no misrepresentation occurred and with the evaluation of ATS' technical proposal, (b) offered an explanation for his decision that runs counter to the evidence before the Agency, and (c) the Contracting Officer's decision and evaluation are so implausible that it could not be ascribed to a difference in view.

Compl. ¶ 98.

Specifically, the CO's decision to interview only three people during his PIA and OCI investigation led him to fail to consider important aspects of the misrepresentation issue.  Pl. Mot. JAR at 23.  The protest Phoenix filed with the GAO asserted that ATS did not have

permission to use the credentials of Phoenix *and* URS employees in its technical proposal.  AR Tab 21 at 1025 ("URS also confirmed with URS employees that they did not give permission for SBAR or ATS to use their respective licenses, certifications and/or training records, nor did they give them directly to ATS."); AR Tab 21 at 1035, 1036.  Therefore, the CO's failure to interview ████████, the contract manager, and ████████ and ████████, the URS employees whose credentials were submitted by ATS as part of its technical proposal, prevented the CO from considering "when, how, and from whom the credentials were obtained and the alleged permission [to use the credentials was] given."  Pl. Mot. JAR at 23-26.

Phoenix also asserts that the CO's explanation for his decision that ATS made no misrepresentation runs counter to the evidence before the Agency.  *Id.* at 27-31.  The CO reported that ████, ████, and ████ told him that they voluntarily provided copies of their credentials before the submission of proposals, but the CO's handwritten interview notes do not indicate when ████ or ████ provided copies of their credentials.  AR Tab 28 at 1214.  Therefore, Phoenix contends that each witness was not interviewed independently and "had the benefit of hearing each other in order to align their respective stories."  Pl. Mot. JAR at 29.  In addition, Phoenix points to a discrepancy between what ████ told the CO—that he gave his credentials to ████ to give to ████—and what ████ stated in a declaration that ATS provided to the CO—that he provided his credentials to ████ and gave ████ verbal authorization to forward them to ATS.  AR Tab 30 at 1225, 1234.

In sum, Phoenix concludes that in light of this evidence, the CO's determinations and findings that there was no PIA and no OCI were so implausible that they "could not be ascribed to a difference in view or the product of agency expertise."  Pl. Mot. JAR at 8.

## b.  The Government's Response.

The Government asserts that there was no misrepresentation issue for the Agency to investigate because the Solicitation did not require evidence of a "commitment" from an offeror's proposed staff members and therefore ATS's proposal did not imply that it had received such commitments.  Gov't Mot. JAR at 21-25, 27-28.

The Government also argues that the Agency's investigation was neither arbitrary nor capricious.  *Id.* at 34-44.  That investigation, the Government asserts, reasonably determined that the proposed workers voluntarily provided their credentials for ATS's use.  *Id.* at 41-42 (citing AR Tab 39 at 1557-61).  The predecessor contractors' employees whose credentials ATS submitted in its proposals signed statements on or before December 1, 2011 confirming that they had "voluntarily provided copies of [their] licenses and certifications and gave verbal authorization to ████, LSS Contract Manager, to forward these documents to Alliance Technical Services for use in their proposal submittal and consideration for future employment under Solicitation FA4610-09-R-0013."   AR Tab 30 at 1232-36.  The three Phoenix employees—████, ████, and ████—told the Contracting Officer, in separate telephone interviews on December 16, 2011, that they had directly or indirectly provided copies of their credentials to ████.  *Id.* at 1224-25.  ████ and ████ said they did so "for future employment opportunities."  *Id.*  The Contracting Officer reported that ████ and ████ said they had previously signed conflicting statements because they feared retribution from Phoenix.  *Id.*

The Government asserts that the Contracting Officer's decision not to interview ▮▮▮▮▮, ▮▮▮▮▮, and ▮▮▮▮▮ was not a failure to consider important aspects of the misrepresentation issue.  Gov't Mot. JAR at 37-40.  The Government quotes two pages of PMI's Protest saying, "**URS** did not give permission to ATS to use [URS's employees'] licenses, certifications or training records in ATS's technical proposal."  *Id.* at 38 (quoting AR Tab 21 at 1025, 1036) (emphasis and alteration by the Government).  Even if PMI did allege that ATS improperly used URS employees' credentials, the Government asserts, the decision not to interview ▮▮▮▮▮, ▮▮▮▮▮, and ▮▮▮▮▮ was reasonable in light of Federal Circuit precedent stating that "[t]he contracting officer is the arbiter of what, and how much, information he needs."  *Id.* (quoting *John C. Grimberg Co.* v. *United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)).

### c.    The Defendant-Intervenor's Response.

"[T]he Agency rationally concluded that interviews of ▮▮▮▮▮, ▮▮▮▮▮ and ▮▮▮▮▮ were necessary because—at the time of the investigation—only they had given contradictory written statements concerning whether they had or had not given verbal permission for the use of their credentials in ATS's proposal."  Int. Mot. JAR at 28 (citing AR Tab 40 at 1577 (the Agency's Memorandum of Law filed with the GAO)).

### d.    The Court's Resolution.

An agency's decision is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

In light of the court's determining that the Solicitation did not require a commitment from proposed staff members to work for the offeror, if the Agency awarded the offeror the contract, whether such a commitment existed was not "an important aspect of the problem" the Agency investigated.  Phoenix's focus has been on whether the proposed staff members voluntarily submitted their credentials for ATS to use in its bid, but nothing in the Solicitation requires voluntary submissions from the proposed staff members to the offerors.  Therefore, although the court agrees with Phoenix that its Protest did allege that ATS improperly used the credentials of URS employees as well as Phoenix employees, the Contracting Officer's decision not to interview ▮▮▮▮▮, ▮▮▮▮▮, or ▮▮▮▮▮ did not constitute a failure to consider an important aspect of the problem.

The CO's explanation for his decision *did* involve his finding that the proposed staff members voluntarily allowed ATS to use their credentials in its proposal.  AR Tab 39 at 1556-62 (Contracting Officer's Statement of Facts).  And, this decision was supported by sufficient evidence to survive rational basis review.  *See Savantage Fin. Servs.*, 595 F.3d at 1287 (describing the standard of review).  At the time the CO conducted his investigation, Phoenix had presented evidence that ATS had used the credentials of three Phoenix employees without their permission; the CO individually interviewed all three, each of whom told him that they had, in fact, voluntarily made their credentials available.  AR Tab 37 at 1492-93.  The CO's

explanation for his decision that ATS committed no material misrepresentation thus did not run counter to evidence before the Agency.

The CO's conclusion that no misrepresentation occurred also was plausible, given that the Solicitation did not require a commitment from proposed staff members to work for the offeror if the Agency awarded the offeror the contract.

## IV.   CONCLUSION.

For the foregoing reasons, Phoenix's June 12, 2012 Motion To Supplement The Administrative Record And The Court's Record is denied, the Government's June 12, 2012 Motion To Strike is granted, Phoenix's September 6, 2012 second Motion To Supplement The Administrative Record And The Court's Record is granted, ATS's August 6, 2012 Motion To Dismiss Pursuant To RCFC 12(b)(1) is denied, the Government's and ATS's July 9, 2012 Motions For Judgment On The Administrative Record are granted, and Phoenix's June 22, 2012 Motion For Judgment On The Administrative Record is denied.   The Clerk of the Court is directed to enter judgment for the Government and the Intervenor.

**IT IS SO ORDERED.**

s/ Susan G. Braden____
**SUSAN G. BRADEN**
**Judge**